IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:07-CV-447-D

WILLIAM C. CLEVENGER,                    )
     Plaintiff,                            )
                                         )
       v.                               )
                                         )    **MEMORANDUM &**
                                         )    **RECOMMENDATION**
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
     Defendant.                            )
                                         )

     This matter is before the Court upon Plaintiff's Motion for Summary Judgment (DE-8) and Defendant's Motions for Judgment on the Pleadings (DE-32). Plaintiff has also filed a response to Defendant's motion (DE-34). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter is before the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is HEREBY RECOMMENDED that Plaintiff's Motion for Summary Judgment (DE-8) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED, and the final decision by Defendant be AFFIRMED.

**I. Statement of the Case**

     Plaintiff filed an application for disability insurance benefits ("DIB") on December 1, 2000 (Tr. 69-71). This application was denied initially and upon reconsideration. (Tr. 38).

1

Another application for DIB as well as a request for supplemental security income ("SSI") was filed by Plaintiff on August 27, 2004 (Tr. 15). In the August 27, 2004 applications, Plaintiff alleged a disability onset date of October 9, 1997. These applications were denied initially and upon reconsideration (Tr. 15). Two hearings were conducted before an Administrative Law Judge ("ALJ") on March 1 and April 10, 2006 (Tr. 15). In an opinion dated July 19, 2006 the ALJ determined that Plaintiff was not disabled at any time through the date of his decision (Tr. 14-23). The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on September 13, 2007(Tr. 5-8).

Plaintiff filed the instant action on November 11, 2007 (DE-1). On May 15, 2008, this Court remanded Plaintiff's case because significant portions of the recording from the March 1, 2006 hearing were inaudible (DE-17). The Appeals Council vacated the final decision of the Commissioner on December 8, 2008 and remanded the case to an ALJ for a *de novo* hearing (Tr. 743).

Following a *de novo* hearing held on May 13, 2009, an ALJ again found Plaintiff not disabled in a decision dated June 24, 2009 (Tr. 576-588). The parties' pending dispositive motions were referred to the undersigned on April 5, 2010 (DE-38).

## II.  Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript

2

> of the record, a judgment affirming, modifying, or reversing the
> decision of the Commissioner of Social Security, with or without
> remanding the cause for a rehearing. The findings of the Commissioner
> of Social Security as to any fact, if supported by substantial evidence,
> shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## III.  Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant
> engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b).

3

> If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
>
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (Tr. 578). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) post traumatic stress disorder ("PTSD"); 2) depression; 3) anxiety; 4) antisocial personality disorder; 5) hypertension; 6) degenerative disc disease; 7) a torn labrum in his left shoulder; 8) polysubstance abuse; and 9) residuals from a dog bite in his left lower extremity (Tr. 578). In completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 579).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not able to perform his past relevant work as a electrician, construction worker and painter (Tr. 586). At step five, however, the ALJ found that there were jobs that Plaintiff could perform and that these jobs existed in significant numbers in the national economy.

4

(Tr. 587). Accordingly, the ALJ determined that Plaintiff had not been under a disability as of June 24, 2009 (Tr. 587-588). The medical record contains substantial evidence supporting each of the ALJ's determinations. A summary of this evidence now follows.

Plaintiff received treatment while incarcerated with the North Carolina Department of Correction from April 21, 1998 until October 7, 2000 (Tr. 210-281).

A serology report dated August 3, 1998 did not detect human immunodeficiency virus (HIV)(Tr. 281).

On April 21, 1998, Plaintiff received treatment for a broken tooth (Tr. 276). Specifically, Oralgel was applied to the affected area (Tr. 277).

Plaintiff claimed he was depressed on April 30, 1998 (Tr. 274). Although he initially stated he was suicidal, he later indicated that "I'm not going to do anything to myself, I just get upset when people ignore me . . ." (Tr. 274). It was later noted that Plaintiff was "much better" (Tr. 274).

When completing a health screening form for kitchen duty on May 17, 1998, Plaintiff stated that he did not have any physical disability limitations and that his current medications did not make him drowsy (Tr. 272).

Again on June 19, 1998 it was indicated that Plaintiff did not have any: 1) current acute conditions; 2) chronic conditions; or 3) physical disability limitations (Tr. 268). It was also noted that Plaintiff was not currently taking any medications or undergoing any treatments (Tr. 268).

During an evaluation dated June 25, 2008, Plaintiff stated that he felt positive and

5

hopeful about his future and that he "really loved himself" (Tr. 266).

A treatment note dated July 3, 1998 stated that Plaintiff demonstrated no evidence of ocular injury (Tr. 248).

After undergoing a physical assessment on July 27 and 28, 1998, it was noted that Plaintiff was "within normal limits" in all areas evaluated (Tr. 263). Plaintiff did not list any current health complaints (Tr. 262).

On August 5, 1998, Plaintiff suffered multiple dog bites (Tr. 259). The bitten area was cleansed and an ointment was applied (Tr. 259). Plaintiff stated on August 7, 1998 that the wound was "hurting worse" and that his pain medications were not helping (Tr. 258). Upon examination, Plaintiff's range of motion was within normal limits, however (Tr. 257). Ultimately, the examining physician stated that "this will no doubt take some time to resolve but [there is] no sign of irreversible damage" (Tr. 257). On August 29, 1998, it was observed that the wound areas were healing well (Tr. 246).

During a September 10, 1998 examination it was noted that Plaintiff's affect was generally bright (Tr. 245).

A radiological report dated February 11, 2000 identified no fracture, dislocation or area of bony destruction (Tr. 211). Only minimal early osteoarthritic changes were noted (Tr. 211).

On October 11, 2000 Plaintiff was diagnosed with PTSD and requested mental health services (Tr. 372). Plaintiff stated on November 27, 2000 that he suffered from: 1) exaggerated startle responses, 2) irritability; 3) inability to recall most of the trauma; 4)

6

intrusive thoughts; 5) nightmares; and 6) sadness (Tr. 362). In addition, Plaintiff indicated he was treated with Neurontin, Prozac and Trazodone (Tr. 356). According to Plaintiff, Prozac effectively treated his symptoms (Tr. 356). Furthermore, Plaintiff stated that he was capable of performing janitorial work while he was in prison (Tr. 357). During this intake interview, it was noted Plaintiff gave "varying interpretations of his past history" (Tr. 357).

Dr. Stefani Frost examined Plaintiff on March 17, 2001 (Tr. 282-286). During this examination, Plaintiff complained of "a left leg problem", posttraumatic stress disorder, and seizures (Tr. 282). Plaintiff stated that he experiences numbness and cramping in his left thigh (Tr. 282). He also stated that his leg occasionally "gives out" on him and that he is unable to walk (Tr. 282). In addition, he stated that he was in pain most of the time, and he rated his pain as "9/10 on a 0 to 10 scale, 10 being most severe" (Tr. 282-283). Furthermore, Plaintiff asserted that he suffers from "flashbacks" and that he feels people are "out to get him" (Tr. 283). Because of this, Plaintiff noted that he has frequent nightmares. Plaintiff stated that he was being treated with Prozac and Trazodone for these conditions. Finally, Plaintiff claimed that he had a history of seizures dating back to 1997 (Tr. 283). However, he was unable to precisely describe the nature of the seizures (Tr. 283). During this evaluation, Plaintiff indicated that he was capable of walking outside, taking the trash out and doing light housework (Tr. 283). Upon examination, Plaintiff did not have any difficulty taking off his shoes or getting on or off the examination table (Tr. 283). His gait was nonataxic and he was able to walk on his heels and toes (Tr. 284). Plaintiff's motor strength was generally 5/5 throughout (Tr. 285). Ultimately, Dr. Frost determined that Plaintiff "was

7

still able to perform manipulative movements with his hands" (Tr. 286). She also opined that Plaintiff could stand and walk for six hours in an eight hour workday with normal breaks (Tr. 286). According to Dr. Frost, Plaintiff would not require an assistive device (Tr. 286). Furthermore, Dr. Frost indicated that Plaintiff could frequently lift and/or carry 25 pounds and occasionally lift and/or carry 50 pounds (Tr. 286). No postural, manipulative, visual, communicative or environmental limitations were noted (Tr. 286).

An assessment of Plaintiff's physical residual functional capacity ("RFC") was conducted on April 3, 2001 by Dr. Joseph Dykes (Tr. 289-296). It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying (Tr. 290). No postural, manipulative, visual or communicative limitations were noted (Tr. 291-293). Other than avoiding all exposure to hazards such as machinery or heights, no environmental hazards were noted (Tr. 293).

Plaintiff's mental RFC was evaluated on April 6, 2001 (Tr. 297-314). It was noted that Plaintiff was only moderately limited in his ability to: 1) understand, remember and carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) perform activities within a schedule, maintain regular attendance. and be punctual within customary tolerances; 4) work in coordination with or proximity to others without being distracted by them; 5) complete a normal workday and workweek without interruptions from

8

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 6) interact appropriately with the general public; 7) accept instructions and respond appropriately to criticism from supervisors; 8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 10) respond appropriately to changes in the work setting; and 11) set realistic goals or make plans independently of others (Tr. 297-298). In all other areas of his mental RFC, Plaintiff was not significantly limited (Tr. 297-298). Furthermore, Plaintiff was described as having: 1) mild to moderate restrictions in his activities of daily living; 2) moderate difficulties in maintaining social functioning; and 3) moderate difficulties in maintaining concentration, persistence or pace (Tr. 311). There was insufficient evidence to determine whether Plaintiff had suffered from any extended duration episodes of decompensation (Tr. 311). It was determined that Plaintiff's impairments did not precisely satisfy the diagnostic criteria for the disability listed at 12.04 (Tr. 304). Likewise, it was also determined that Plaintiff did not satisfy the "C" criteria of the listings (Tr. 312). However, Plaintiff was assessed as meeting the listing at 12.06 "Anxiety-Related Disorders" (Tr. 306).

On July 6, 2001, Plaintiff informed an examining physician that he took insulin on a regular basis (Tr. 354). However, when asked, Plaintiff could not recall what dosage he required (Tr. 354). Ultimately the examining physician stated that Plaintiff "was not believed to be a diabetic" (Tr. 354). Likewise, on July 9, 2001 it was noted that Plaintiff reported feeling depressed but did not exhibit depressive or anxiety symptoms (Tr. 353).

Plaintiff also received treatment at Durham Regional Hospital (Tr. 377-401). On January 28, 2001, Plaintiff was treated in the emergency room after he was stabbed in the chest (Tr. 392). He was described as "intoxicated . . .[and] moderately cooperative" (Tr. 392). He attempted to leave the emergency prior to receiving treatment, but was deemed too intoxicated to leave on his own (Tr. 392). The police were called to bring him back to the emergency room (Tr. 392). Ultimately, Plaintiff was diagnosed with: 1) a stab wound to the right hand; 2) chest wall abrasions; and 3) alcohol intoxication and abuse (Tr. 393). It was also noted that Plaintiff might have a nerve laceration, and he was instructed to follow up with a hand specialist (Tr. 390). Thereafter, on March 1, 2001, Plaintiff was treated in the emergency room after he was allegedly assaulted by his brother (Tr. 385). He was diagnosed with: 1) head injury; 2) nasal fracture; and 3) possible blowout fracture (Tr. 386). Plaintiff was prescribed Vicodin for pain. Again on December 31, 2002, Plaintiff reported to the emergency room (Tr. 383) On this occasion he was intoxicated (Tr. 383). Treating physicians were informed by Plaintiff that he "does not normally drink" (Tr. 383). Furthermore, Plaintiff was apparently working in construction at this time (Tr. 383). Plaintiff was described as "well-developed . . [and] well-nourished" (Tr. 383). Plaintiff chose to leave the emergency room prior to the completion of diagnostic studies and a final diagnosis (Tr. 384). However it was opined that Plaintiff "was intoxicated based on the history and that he has sobered up with time and fluids" (Tr. 384). Plaintiff was treated in the emergency room again on November 25, 2003 (Tr. 377). He complained of left-sided chest pain after landing on his back while trying to cut limbs out of a tree (Tr. 377). During his examination,

10

Plaintiff asserted that he did not drink and that he lived alone (Tr. 377). Plaintiff also stated that he worked in construction doing heavy lifting (Tr. 377). Ultimately, Plaintiff was diagnosed with a left-sided rib fracture (Tr. 378).

The Durham County Detention Center also provided treatment for Plaintiff. On May 27, 2002, Plaintiff signed a form in which he claimed that he had not recently received any mental health treatment (Tr. 315). However, Plaintiff did receive treatment while he was housed at the detention center (Tr. 320).

On November 20, 2004, Plaintiff was examined by Dr. Janakaram Setty (Tr. 402-405). Dr. Setty's general findings were unremarkable (Tr. 404). Plaintiff was diagnosed with: 1) chronic depression; 2) PTSD; 3) hypertension; and 4) hyperlipidemia (Tr. 404). However, Dr. Getty also noted that Plaintiff was unlimited in the number of hours he could stand, walk or sit during a normal eight hour workday (Tr. 404). It was also determined that Plaintiff did not require an assistive device for ambulation, and had no limitations on the amount of weight he could lift or carry (Tr. 404). Plaintiff was deemed to have no postural, manipulative, visual, or communicative limitations (Tr. 404-405).

Dr. Deron Coy examined Plaintiff on December 6, 2004 (Tr. 406-409). In assessing Plaintiff's PTSD, Dr. Coy stated that Plaintiff was not able to give examples of re-experiencing or reliving any specific event (Tr. 406). He also indicated that Plaintiff did not have symptoms of hypervigilance or anxiety (Tr. 406). With regard to Plaintiff's depression, Dr. Coy noted that Plaintiff "does have some self-deprecating ideas regarding himself and his ability to make it in the community" (Tr. 407). Plaintiff also reported significant

11

hopelessness (Tr. 407). Dr. Coy diagnosed Plaintiff with: 1) adjustment disorder with depressed mood; and 2) antisocial personality disorder (Tr. 408). Specifically, Dr. Coy observed that Plaintiff had "mild to moderate depression as a result of his adjustment difficulties as he comes back into the community after a period of incarceration" (Tr. 408). In addition, Dr. Coy opined that "[g]iven . . . [Plaintiff's] reported change in personality after a period of being struck in the head . . . it is recommended that neuropsychological testing be used to assess[] . . .impulsivity and any potential congnitive deficits" (Tr. 408). Ultimately, Dr. Coy believed that Plaintiff would be capable of handling any disability benefit he might be awarded (Tr. 409).

On January 13, 2005, Dr. Charles Burkhart opined that Plaintiff did not have impairments which significantly restricted his functional capacity (Tr. 410). This opinion was affirmed by another physician on May 14, 2005 (Tr. 453).

Plaintiff's mental RFC was evaluated again on January 26, 2005 by Dr. Clifford Charles (Tr. 411-414). He stated that Plaintiff was markedly limited in his ability to interact appropriately with the general public (Tr. 412). However, Plaintiff was only moderately limited in his ability to: 1) understand, remember and carry out detailed instructions; 2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 3) accept instructions and respond appropriately to criticism from supervisors; 4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 5) respond appropriately to changes in the work setting (Tr. 411-

12

412). Likewise, Dr. Charles opined that Plaintiff was only mildly limited in the restriction of his activities of daily living (Tr. 425). He did note that Plaintiff was moderately limited with regard to maintaining social functioning and maintaining concentration, persistence or pace (Tr. 425). Plaintiff was not significantly limited in all other facets of his mental RFC (Tr. 411-412). Furthermore, Dr. Charles indicated that Plaintiff's symptoms did not precisely satisfy the diagnostic criteria for the impairments described at Listings 12.04 or 12.08 (Tr. 418-422). Based on these findings, Dr. Charles determined that Plaintiff's "mental issues are not debilitating to preclude . . .[simple, routine, repetitive tasks] . . .[Plaintiff] maintains [an] ability for work . . ." (Tr. 413). Specifically, Dr. Charles stated that Plaintiff could: 1) understand and remember simple instructions; 2) sustain attention for simple tasks and details at a non-rapid pace; and 3) minimally relate appropriately to others in a low contact environment (Tr. 413). These findings were all affirmed by Dr. Giuliana Gage on May 12, 2005 (Tr. 413, 427).

Lincoln Community Health Center also provided treatment for Plaintiff from December 28, 2000 until January 11, 2006 (Tr. 429-452; 454-466). On March 28, 2001, Plaintiff had no complaints other than symptoms related to his dog bite (Tr. 449). During a August 19, 2003 examination, Plaintiff stated that "he works remodeling houses" (Tr. 448). He was assessed with: 1) gastroesophageal reflux disease ("GERD"); 2) smokeless tobacco dependence; 3) a history of alcoholism; 4) bipolar disorder; 5) fatigue and lack of libido; 6) low vitamin B12 level; and 7) mild hypertension (Tr. 448). It was stated on December 3, 2004 that Plaintiff "does not seem to fully meet PTSD criteria at this time . . ." (Tr. 439).

13

Plaintiff also noted during this visit that "he was doing very well on his current medications of Prozac . . . and Neurontin . . ." (Tr. 439). However, his symptoms had worsened recently because he was not taking his Prozac (Tr. 439). Dr. James Carter stated on January 6, 2005 that Plaintiff was "doing reasonably well on his medication and I will make no changes at this time." (Tr. 432). Finally, on March 3, 2005, Plaintiff was not in emotional distress (Tr. 429). He also demonstrated: 1) normal intelligence; 2) intact memory; and unimpaired judgment (Tr. 429).

Plaintiff was admitted to Granville Medical Center on January 7, 2008 (Tr. 756). Prior to being admitted to the hospital, Plaintiff cut himself with superficial lacerations on the top of his forehead with a razor (Tr. 772). In addition, Plaintiff was threatening suicide and intoxicated (Tr. 772). He was diagnosed with: 1) severe depression; 2) acute chronic alcohol intoxication/dependency; 3) hypertension; and 4) PTSD (Tr. 756).

Dr. Andree Allen examined Plaintiff on January 9, 2008 (Tr. 772-777). Plaintiff stated that was not interested in inpatient rehabilitation (Tr. 772). He also denied any anxiety or hypervigilance (Tr. 773). During this interview, Plaintiff claimed his attorney advised him not to seek full time work (Tr. 773). Upon examination, Plaintiff had normal speech and full range of affect (Tr. 774). According to Dr. Allen, Plaintiff "felt fine not depressed" (Tr. 774). Plaintiff was coherent and ready to go home (Tr. 774). He was not suicidal and was agreeable to outpatient substance abuse treatment (Tr. 774).

Dr. Leo Thomas Barber examined Plaintiff on March 8, 2008 (Tr. 839). Plaintiff complained of pain, although he appeared well and was in no distress (Tr. 839). He was alert

14

and oriented. His mood and affect were "unusual but baseline for him" (Tr. 839). Ultimately he was diagnosed with: 1) unspecified arthropathy; and 2) hyperlipidemia (Tr. 839).

Plaintiff was examined by Dr. David Susco on April 7, 2008 (Tr. 887). Plaintiff was diagnosed with bipolar disorder and it was stated that he "continues to struggle" (Tr. 887). However, on June 16, 2008, Plaintiff indicated that "things are going fairly well for him" (Tr. 885). His mood was stable and Plaintiff denied any suicidal thinking (Tr. 885). Likewise, Plaintiff denied any other problems (Tr. 885). Dr. Susco noted that Plaintiff's mood was good and his affect was full range (Tr. 887).

Dr. Leslie Montana examined Plaintiff on August 13, 2008 (Tr. 882-883). Plaintiff's mood was good and his affect was full range (Tr. 882). He did not demonstrate any psychotic symptoms, nor did he demonstrate suicidal or homicidal ideation (Tr. 882). Ultimately, Dr. Montana opined that Plaintiff was "fairly stable" (Tr. 882). This assessment was reiterated by Dr. Montana on December 5, 2008 and March 6, 2009 (Tr. 880-881). During these appointments, it was also generally noted that Plaintiff: 1) ambulated without difficulty; and 2) was well appearing and well nourished (Tr. 880-883).

On December 5, 2008, Plaintiff was examined based on complaints of shoulder pain (Tr. 828). An x-ray of Plaintiff's left shoulder was unremarkable and negative for arthritis, fracture or osteonecrosis (Tr. 847). When he was examined that day, his mood and affect were normal (Tr. 829).

Plaintiff received treatment at Triangle Orthopaedic Associates P.A. on December 15,

15

2008 for his shoulder pain (Tr. 850). He stated that his symptoms are made worse by reaching overhead and made better by resting (Tr. 850). Upon examination, Plaintiff's muscle strength in all major muscle groups of the shoulder was normal and symmetric (Tr. 851). Plaintiff was treated with a corticosteroid injection (Tr. 851). He was "happy with the results" (Tr.851). Finally, Plaintiff was instructed to begin a home exercise program (Tr. 851). Plaintiff appeared for a follow-up appointment on April 20, 2009 (Tr. 889). At that time he was diagnosed with a labral tear and physical therapy was recommended (Tr. 889).

Plaintiff testified during the May 13, 2009 hearing in this matter. He stated that walking to the mail box and back caused his back to hurt severely (Tr. 595). Therefore, he spends most of the day watching television (Tr. 595). Furthermore, Plaintiff stated that he could not drive because his medications made him too drowsy (Tr. 595). However, he also noted that he does not have a driver's license (Tr. 595-596). Plaintiff testified that he last worked in 1997 (Tr. 597).

With regard to Plaintiff's testimony, the ALJ made the following findings:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The claimant's record of treatment for his alleged back pain is not indicative of the presence of functional limitations more severe than are

16

set forth in this residual functional capacity evaluation. For example, the claimant did not return to his treating physicians for over one year after February 2007 to receive treatment (Exhibit 27F). Additionally, the treatment he has received has been relatively conservative and routine in nature and does not suggest the presence of debilitating limitations and symptoms. For example, only medical management has been conservative has been prescribed and no imaging studies were obtained by the claimants treating physicians. Additionally, the claimant tuned down physical therapy and opted for corticosteroid injections and home exercise (Exhibit 26F). Further, the claimant has indicated to his medical providers as noted above that his back pain is well-controlled and rendered non-severe through the use of his prescribed medication. Moreover, the undersigned did not find the claimant's testimony at hearing to be convincing. Thus, as the finder of fact, the undersigned hereby finds that the claimant's testimony regarding the symptoms and limitations resulting from his back pain are not fully credible. They are not supported by his treatment history, the objective medical evidence, nor are they supported by the record as a whole. Nevertheless, the undersigned has given the claimant every benefit of the doubt and restricted his residual functional capacity based on his subjective complaints to the extent they are reasonably consistent with the evidence of record.

With respect to the claimant's testimony regarding the side effects from his medications, the undersigned finds said testimony to be less than fully credible. Although the claimant's medical records do have some sparse complaints of drowsiness due to his medications, the records indicate that adjustments were made and the claimant did not consistently report daytime drowsiness. For example, in March 2009 the claimant indicated that his medications were working well for him. The note indicates that the claimant stated that he was able to sleep for eight hours at night without feeling too sedated during the daytime (Exhibit 27F/28, 27F/29). Moreover, the claimant's complaints of mild drowsiness to his physicians are far less severe than he asserted at hearing through his testimony. Further, as discussed below, the testimony of the claimant's girlfriend regarding his hypersomnolence is not credible. Ultimately, the medical evidence of record and the claimant's prior statements to his treating physicians that he was not experiencing side effects and his medication were working well show that the claimant's side effects from his medications are not as severe as he alleged at hearing. The undersigned did not find the claimant's

testimony at hearing convincing.

The claimant testified that his activities of daily living have been severely restricted since his alleged onset date. He does not do anything around the house except for sit and watch television. The claimant's testimony is inconsistent with the evidence of record. In 2003, the claimant's medical records indicate he was injured after falling out of a tree that he was trimming (Exhibit 8F). In 2004, the claimant indicated that he usually spent his time helping out his father-in-law around the house in addition to watching television (Exhibit IOF). Then, in January 2008 the claimant indicated that he had to leave a physician's appoint to get home and help his mother do work around the house (Exhibit 24F/2). Moreover, the claimant previously testified that he was able to work as a janitor during the time he was imprisoned from July 1997 through October 2000. In sum, the medical evidence of record indicates that the claimant's activities during his alleged period of disability were not as limited as he asserted at hearing and substantially erode his credibility regarding the severity of his symptoms and limitations.

The claimant's girlfriend, Sue Fuller, also testified at hearing. She indicated that she has been the claimant's live-in girlfriend for nine years. She stated that he takes two naps during the day and sleep about twelve hours per night. She testified that he has nightmares and that "when" his back hurts he can not do much. She further stated that he gets nervous around crowds, but he is okay when friends come over and that he is fine when he takes his medications. The undersigned finds that her testimony is not credible to the extent it is inconsistent with the above residual functional capacity evaluation for the same above-listed reasons that he claimant's testimony is not fully credible. Additionally, Ms. Fuller has a personal interest in the claimant obtaining benefits under Title II and Title XVI of the Social Security Act. First, as the claimant's live-in girlfriend she may stand to benefit financially from an award of benefits. Furthermore, she has a longstanding intimate relationship with the claimant and has an interest in seeing him receive an award of benefits. Accordingly, she is not an independent and detached witness by any means. Finally, her testimony is not consistent with the evidence of record. For example, in March 2009 the claimant told his treating physician that he was only sleeping eight hours per night and was no too sedated during the daytime (Exhibit 27F/28).

In sum, the above residual functional capacity assessment is supported by the objective medical evidence, the record as a whole, and the testimony of independent medical expert Dr. David Owens.
(Tr. 585-586).

Based on this record, the ALJ made the following findings with regard to Plaintiff's impairments:

Independent medical expert Dr. David Owens, MD, testified at hearing than none of the claimant's impairments met or medically equaled any Listing from Appendix 1 either in combination with, or in the absence of, the claimant's substance abuse disorders. Dr. Owens' opinion is based on a review of the evidence of record and is consistent with the evidence of record. Accordingly, the undersigned assigns his opinion great weight as to whether any of the claimant's impairments or the combination thereof meets or is medically equivalent to a listing from Appendix I.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, 12.08, and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within I year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has moderate di fficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no documented episodes of decompensation, which have been of extended duration. Dr. Owens' testimony supports these findings and the undersigned finds his opinion to be persuasive with respect to the limitations imposed by the claimant's impairments.

19

Further, these impairments are consistent with the evidence as a whole.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria of each listing are satisfied. In this case, the evidence fails to establish the presence of the "paragraph e" criteria in any of the aforementioned listings.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various unctions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

These findings are consistent with the residual functional capacity assessment outlined below. . . .

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: limited to simple, routine, repetitive tasks at a non-production pace; occasional contact with co-workers and the general public; but, can identify normal workplace hazards and can adjust to normal changes in the workplace.
(Tr. 579-580).

The Court hereby finds that there was substantial evidence to support each of the

ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including

the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies entirely on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Summary Judgment (DE-8) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED, and the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 19th day of April, 2010.

_____
William A. Webb
U.S. Magistrate Judge